UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                      Case No. 1:18−cr−167

v.                                        Paul L. Maloney
                                        United States District Judge

TREBARIUS MCGEE,

    Defendant.
_____/

**MOTION FOR REDUCTION IN SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

# Exhibit E

Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1. I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 132,000 people have been diagnosed with COVID-19 around the world and 4,947 have died.[2] In the United States, about 1,700 people have been diagnosed and 41 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing.

4. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.
[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed March 13, 2020.
[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed March 13, 2020.

6. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

7. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

8. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy. At least one nursing home in the Seattle area has had cases of COVID-19 and has been quarantined.

9. The Seattle metropolitan area, hit hard by COVID, is the epicenter of the largest national outbreak at this time. Therefore, it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facility in Tacoma, Washington. Immigration courts and the ICE field office in Seattle have already closed this month due to staff exposure to COVID-19.

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

11. Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

12. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

13. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks

      to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

14. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department.  Those who test negative should be released.

15. This release cohort can be separated into two groups.  Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from NWDC by their families or sponsors.  Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors.  Group 2 could be released to a housing venue for 14 days, determined in concert with the Pierce County or Washington State Department of Health.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this *14th* day in March, 2020 in New York City, New York.

Robert B. Greifinger, M.D.